RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MCKEON PRODUCTS, INC.,

　　　　　　　　　　*Plaintiff-Appellee*,

　　v.

HOWARD S. LEIGHT AND ASSOCIATES, INC.,

　　　　　　　　　　　　*Defendant*,

HONEYWELL SAFETY PRODUCTS USA, INC., as successor-in-interest,

　　　　　　　　*Interested Party-Appellant*.

No. 20-2279

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:95-cv-76322—Paul D. Borman, District Judge.

Argued:　June 9, 2021

Decided and Filed:　October 8, 2021

Before:　NORRIS, KETHLEDGE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Mark L. Johnson, GREENE ESPEL PLLP, Minneapolis, Minnesota, for Appellant. J. Michael Huget, HONIGMAN, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Mark L. Johnson, Holley C. M. Horrell, GREENE ESPEL PLLP, Minneapolis, Minnesota, Jill M. Wheaton, DYKEMA GOSSETT PLLC, Ann Arbor, Michigan, for Appellant. J. Michael Huget, Sarah E. Waidelich, Patrick Rawsthorne, HONIGMAN, Ann Arbor, Michigan, for Appellee.

———————————

**OPINION**

———————————

NALBANDIAN, Circuit Judge.  In 1995, McKeon Products ("McKeon") sued Howard S. Leight and Associates ("Leight") over its use of a phonetically identical trademark.  Both companies made earplugs.  McKeon used the brand name "MACK'S," and Leight used the brand names "MAX" and "MAX-LITE."[1]  The potential for confusion is obvious.

Rather than litigate McKeon's trademark infringement claims, the parties entered a settlement agreement that the district court approved by consent decree.  Their goal was to prevent consumer confusion over the brand names.  To achieve that end, Leight agreed not to sell its MAX-brand earplugs into the "Retail Market."  And McKeon agreed that Leight could continue to sell its earplugs in "the Industrial Safety Market and elsewhere, except as expressly agreed."

But the agreement and the consent decree never contemplated the internet.  In 2017, McKeon complained to Honeywell (which now owns Leight) about sales of MAX-brand earplugs on Amazon and other retail websites.  McKeon argued that the consent decree prevents Honeywell from selling these earplugs on those sites.  Honeywell responded that the consent decree's definition of the retail market didn't cover websites.  And, in any event, distributors had been selling MAX-brand earplugs on Amazon and similar websites for more than a decade without complaint from McKeon.  So laches barred any effort by McKeon to belatedly enforce the consent decree.

Unpersuaded, McKeon moved the district court to enforce the consent decree and end Honeywell's online retail sales.  McKeon won below, where the district court held that laches wasn't an available defense and that McKeon had the correct interpretation of the consent decree.

———————————

[1]For simplicity's sake, we refer to both of Leight's trademarks together as the "MAX-brand."

Honeywell challenges both determinations. So this appeal poses three questions. Is laches available to Honeywell? If so, does laches bar McKeon's motion to enforce the consent decree against the allegedly prohibited online sales? And if McKeon's motion was timely, is its argument that some websites fall into the consent decree's definition of the retail market correct?

## I.

McKeon has sold "MACK'S" earplugs to retail consumers since the 1960s. In the 1980s, Leight began marketing and selling MAX-brand earplugs to distributors. The brand names are phonetically identical.

In 1995, McKeon sued Leight for trademark infringement. The company was concerned that MAX-brand earplugs were encroaching into the retail market. McKeon had historically focused its sales on retail consumers and had understood that MAX products were generally sold to industrial customers. McKeon moved for a preliminary injunction the next year.

The parties settled before the district court decided McKeon's motion. Neither party admitted liability, and the district court did not make any finding of consumer confusion. The settlement produced a consent decree—styled as a "permanent injunction"—intended "to minimize the likelihood of confusion concerning the parties' respective trademarks by Leight's sale and marketing of [MAX-brand] earplugs in the Retail Market." (R. 32-2, PageID 31–32.) None of its terms prohibits McKeon's sales or marketing in any way. Instead, the parties regulated the business practices of Leight and its various distributors. For example, Leight had to stop any packaging of MAX-brand earplugs that made their "sale and distribution appropriate for the Retail Market" and ban its distributors from repackaging its earplugs and using the MAX-brand trademarks. (*Id.* at PageID 31.) The consent decree explicitly binds Leight's successors and any party with actual notice.

The consent decree divided the markets into which McKeon and Leight could sell their products. McKeon got the "Retail Market," and Leight got the "Industrial Safety Market and elsewhere." (*Id.* at PageID 31–32.) The parties defined the "Retail Market" as "the market consisting of all retail establishments including the D[r]ug and Grocery Market, sporting goods

stores and mass merchandisers." (*Id.* at PageID 30.) Mass merchandisers include Walmart, Target, and Meijer. (*Id.* at PageID 32.)

The "Drug and Grocery Market" includes "retail establishments where medicines and miscellaneous articles such as cosmetics, food and film and/or where food stuffs, meats, produce, dairy products and other household supplies are the principal products sold as well as any distributor or supplier who sells to these markets." (*Id.* at PageID 29–30.) Walgreens is one example. (*Id.* at PageID 30.)

Leight retained its right to sell MAX-brand earplugs "in the Industrial Safety Market and elsewhere, except as expressly agreed in the Consent Order." (*Id.* at PageID 32.) The "Industrial Safety Market" is "the market in which manufacturing entities purchase earplugs and other hearing protection for their employees' use as well as any distributor or supplier who sells within that market." (*Id.* at PageID 30.)

Correspondence from 1999 documents show McKeon handled an alleged violation of the consent decree by Bacou USA ("Bacou"), which owned Leight at the time. McKeon complained about its discovery of MAX-brand earplugs in drug stores and suggested that this issue had arisen before. After reminding Bacou of its "affirmative duty" to ensure MAX-brand earplugs are not sold to retailers, McKeon disclaimed any responsibility to "play policeman" and asked for copies of the requirements that Bacou was giving its distributors. (R.32-6, Bacou Correspondence, PageID 62–64.) Bacou updated its distribution requirements to include an explicit ban on the resale of MAX-brand earplugs into "retail/consumer" markets. (*Id.* at PageID 78.) And it chastised a vendor that both McKeon and Bacou suspected to be a problem.

After this dispute fizzled out, the record includes no further correspondence about the consent decree until 2017. McKeon has represented both in a declaration and at the hearing on the motion to enforce that it has regularly worked with Leight's parent company at any given time to resolve alleged sales of MAX-brand earplugs in the retail market.

By 2009, Sperian Protection ("Sperian"), which then owned Leight, was selling MAX-brand earplugs directly on Amazon. Honeywell bought Sperian, and thus Leight, in 2010.

Honeywell has never suspended these online sales, which grew by almost 70% from 2016 to 2017 after growing by 52% from 2015 to 2016.

In September 2017, McKeon emailed Honeywell after its discovery of MAX-brand earplugs available for sale on Amazon. The email asserted that the sales violated the consent decree and directed Honeywell to cease and desist. Honeywell responded that its online sales of MAX-brand earplugs were "in the industrial safety market [] to manufacturing entities, distributors, and resellers." (R.32-4, Oct. 25, 2017 Email, PageID 38.) McKeon accused Honeywell of improperly narrowing the consent decree's vision of the retail market. It described Amazon as "the leading internet retail marketplace," and further complained about sales McKeon had discovered on other websites, like Walmart's. (R.32-5, Nov. 13, 2017 Letter, PageID 42.) McKeon offered to give Honeywell time to remove its MAX-brand products from these websites. The record doesn't contain any further correspondence between the parties.

In March 2018, McKeon moved the district court to enforce the consent decree. Magistrate Judge Stafford held a hearing on laches and the interpretation of the consent decree. She concluded that laches was not an available defense to the motion to enforce and that Honeywell's online sales violated the consent decree. District Judge Borman adopted her Amended Report and Recommendation and granted McKeon's motion.

Honeywell moved to stay the order and filed a notice of appeal while that motion was pending. The district court stayed its ruling and required Honeywell to pay a $500,000 bond.

**II.**

We review both whether laches is available as an affirmative defense and the interpretation of a consent decree de novo. *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007) (laches); *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 228–29 (6th Cir. 2019) (consent decrees).

**III.**

The first issue is whether Honeywell can raise laches as an affirmative defense to McKeon's motion to enforce the consent decree. We have already resolved that question

affirmatively. *See Bergmann v. Mich. State Transp. Comm'n*, 665 F.3d 681, 684 (6th Cir. 2011). A motion to enforce a consent decree seeks an equitable remedy and is thus susceptible to equitable defenses. *Id.* at 683 (citing *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) (Posner, C.J.)). Every other circuit to address whether laches can bar a motion to enforce a consent decree has reached the same conclusion. *Coffey v. Braddy*, 834 F.3d 1184, 1189 (11th Cir. 2016); *Brennan v. Nassau County*, 352 F.3d 60, 63–64 (2d Cir. 2003) (per curiam); *Cook*, 192 F.3d at 695; *cf. Gov't Emps. Ret. Sys. of V.I. v. Gov't of V.I.*, 995 F.3d 66, 90–94 (3d Cir. 2021) ("GERS").

McKeon contends that this general rule should not apply to consent decrees in trademark infringement cases because we have rejected laches where a trademark plaintiff seeks equitable relief.**[2]** *See Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002). Consent decrees are court judgments that appear in all types of case. *See, e.g.*, *GERS*, 995 F.3d at 71 (public pension dispute); *Braddy*, 834 F.3d at 1186 (racial discrimination); *Cook*, 192 F.3d at 694 (public employee tenure). And McKeon doesn't cite any authority supporting the idea that the legal principles applicable to the underlying dispute affect the enforcement of the consent decree that resolved that dispute. This makes sense—the Supreme Court has directed us not to graft even general procedural rules onto consent decrees, let alone particular substantive ones. *Compare* Fed. R. Civ. P. 71 ("When an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."), *with Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975) ("[A] well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be

---

**[2]**It's unclear that the rule McKeon is relying on remains good law after the Supreme Court's recent decisions in *Petrella* and *eBay*. Those cases, like this dispute here, dealt with claims for equitable relief in intellectual property disputes. In *Petrella*, the Supreme Court vacated the dismissal of a Copyright Act suit and overturned the Ninth Circuit's presumptive application of laches to certain copyright cases. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 675–77, 686–88 (2014). And in *eBay*, the Supreme Court vacated an injunction and overturned the Federal Circuit's "categorical" rule for issuing injunctions in certain patent cases. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393–94 (2006). So there is reason to doubt that our own categorical rule—laches cannot be a defense to claims of injunctive relief in trademark cases—remains good law. *Cf. Kehoe Component Sales Inc. v. Best Lighting Prods.*, 796 F.3d 576, 584–85 (6th Cir. 2015) (assuming, rather than holding, that laches was available as a defense to injunctive relief). And if that general rule is no longer good law for trademark cases, then it has no application in our consent decree cases.

benefited by it.") *and Aiken v. City of Memphis*, 37 F.3d 1155, 1167 (6th Cir. 1994) (en banc) (quoting the same).

In sum, then, a motion to enforce a consent decree is an equitable action subject to equitable defenses. Legal doctrines that would apply to the underlying disputes are inapplicable. There is no exception for trademark disputes.

**IV.**

The second issue is whether laches applies. The district court did not consider the merits of laches given its holding that laches was unavailable as an affirmative defense. We generally will not decide issues that were unresolved below. *Lindsay v. Yates*, 498 F.3d 434, 440–41 (6th Cir. 2007). But here, both parties have briefed the issue, they are asking us to decide it, and doing so promotes judicial economy. *Id.*

Honeywell, as the party pleading laches, has the burden of proof to show: (1) lack of diligence by McKeon and (2) prejudice. *See Chirco*, 474 F.3d at 231. We consider prejudice and delay together, weighing everything relevant to whether we ought to grant relief. 11A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2946 (3d ed. 2021). Delay alone cannot warrant laches. *See Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)). Rather, laches is "principally a question of the inequity of permitting the claim to be enforced." *Id.* (quoting *Holmberg*, 327 U.S. at 396).

We will consider any lack of diligence from the time at which McKeon knew or should have known that Leight's successors had violated the consent decree. *See, e.g.*, *Nartron*, 305 F.3d at 409. In other words, constructive notice is the appropriate standard for measuring delay. *See, e.g.*, *United States v. City of Loveland, Ohio*, 621 F.3d 465, 473–74 (6th Cir. 2010); *Nartron*, 305 F.3d at 409 (6th Cir. 2002); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 321–22 (6th Cir. 2001); *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 573–74 (6th Cir. 2000); *see also* 30A C.J.S. *Equity* § 151 (2021); 27A Am. Jur. 2d *Equity* § 139 (2021).

*Cook* is instructive. In *Cook*, the Seventh Circuit affirmed the district court's partial application of laches based in part on the plaintiff's failure to diligently ensure compliance with a consent decree's terms. *See Cook*, 193 F.3d at 298. A consent decree signed in 1983 required the city to notify the plaintiff of future openings in Director-level positions. *Id.* at 694. Openings arose in 1985, 1986, and 1989. *Id.* The city, in violation of the consent decree, failed to tell the plaintiff about them. *Id.* The plaintiff learned about the 1989 opening in 1994, and she sued for backpay. *See id.* The district court applied laches to her claim from 1989 onward, concluding that "a reasonable person in Cook's position, if genuinely interested in a Director's job, would have inquired from time to time regarding vacancies rather than waiting year after year for more than a decade to be notified." *Id.* at 694–95. The Seventh Circuit affirmed, noting the potential absurdity that "Cook could have sought backpay to 1983 on her deathbed, given the lack of an expiration date for the employment option that the consent decree gave her." *Id.* at 695.

Here, McKeon has not unduly delayed its efforts to enforce the consent decree. McKeon discovered Honeywell's sales of its MAX-brand earplugs on Amazon in September 2017. It promptly emailed Honeywell, asking its competitor to cease and desist. McKeon also quickly checked other online retailers' websites to determine whether Honeywell was selling MAX-brand earplugs elsewhere in violation of the consent decree. And it asked Honeywell to end those sales too. "Attempts to resolve a dispute without resorting to a court do not constitute unreasonable delay for determining the applicability of the doctrine of laches." *Kehoe*, 796 F.3d at 585.

Once Honeywell refused, McKeon moved to enforce the consent decree a mere six months later. In commercial litigation, such a short time can hardly be the "unreasonable, prejudicial delay in commencing suit" characteristic of laches. *See Petrella*, 572 U.S. at 667.

Nor is the time that elapsed between the beginning of the MAX-brand's online sales and McKeon's discovery of them an unreasonable delay. Although the standard here is constructive notice, McKeon has no responsibility to "play policeman" at brick-and-mortar retailers, and it is similarly not responsible for policing every corner of the internet. (*See* R.32-6, Bacou Correspondence, PageID 62.) Importantly, Honeywell's Amazon sales increased by almost 70%

from 2016 to 2017. This increased volume led McKeon to discover the violations. Parties subject to consent decrees cannot scale their prohibited conduct over time, using minor undetected violations to justify later larger infringements. Honeywell simply hasn't carried its burden to show that McKeon should have discovered the breaching conduct before Honeywell drastically increased online sales.

Honeywell also fails to show that it was prejudiced by the elapsed time. Honeywell first asserts that if it had known that the internet was off-limits for MAX sales, that "would have been a significant consideration in Honeywell's evaluation of [Sperian's] acquisition." (Appellant Br. at 32.) But that argument fails.

Honeywell's conclusory statement says nothing about what it would have done differently about the acquisition. To establish prejudice, Honeywell must show reliance on the absence of the lawsuit. *See United States v. Bolton*, 781 F.2d 528, 534 (6th Cir. 1985); *Eat Right Foods Ltd. v. Whole Foods Mkt.*, 880 F.3d 1109, 1119 (9th Cir. 2018). It is not enough to say that it would have been a significant consideration—which only shows potential reliance. Honeywell has not shown how anything about the Sperian acquisition would have changed. Merely stating prejudice, without showing how, is not enough. *See Depositors Ins., Co. v. Estate of Ryan*, 637 F. App'x. 864, 871 (6th Cir. 2016) (conclusory allegations are not enough to establish prejudice).

Honeywell's other argument is that it would have focused its advertising on brick-and-mortar stores if it had known it cannot sell online. Maybe. But this argument assumes that Honeywell is barred from selling any MAX-brand earplugs online, which is a mistake. McKeon concedes that the consent decree is not a total prohibition on selling MAX-brand earplugs online. Honeywell may sell MAX-brand earplugs on industrial safety websites. (*Id.*)

This leaves the presumption argument. Honeywell argues that it is entitled to a presumption that McKeon's delay was unreasonable and prejudiced it because McKeon brought its enforcement action outside of the analogous statute of limitations. We disagree.

Although *Bergmann* clarifies that we apply laches here and not a statute of limitations, that does not mean that the latter is irrelevant. Generally, when applying laches, courts will look

to the analogous statute of limitations to determine whether a delay was unreasonable or prejudicial. *See, e.g.*, *Cunningham v. Interlake S.S. Co.*, 567 F.3d 758, 761-62 (6th Cir. 2009); *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985). If a plaintiff asserts a claim within the statutory period, there is a strong presumption that the claim is timely and not prejudicial. *Id.* The defendant then must rebut that presumption. *Id.* But, if the plaintiff asserts the claim beyond the statutory period, it is presumed unreasonable and prejudicial to the defendant. *Id.* The plaintiff then bears the burden of rebutting the presumption. *Id.*

Here, McKeon asserted its claim within the statutory period. Courts treat consent decrees like contracts. *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) ("[A] consent decree or order is to be construed for enforcement purposes basically as a contract."); *see also Bergmann*, 665 F.3d at 684. So the most analogous statute of limitations is the one for enforcement of a contract. *Durking v. Nassau Police Dept.*, 175 F. App'x 405, 408 (2d Cir. 2006) (holding that the "most closely analogous state statute of limitations" for enforcing a consent decree is "the six-year statute of limitations for contracts . . . ."); *see also CMACO Automotive Systems v. Wanxiang America Corp.*, 589 F.3d 235, 248 (6th Cir. 2009) (applying state statute of limitations for contracts and holding that equitable contract claims are time-barred under laches). Under Michigan law, the statute of limitations for contract claims is six years. Mich. Comp. Laws § 600.5807(9) (2018); *Steward v. Panel*, 652 N.W.2d 232, 235 (Mich. Ct. App. 2002).

Honeywell wants us to look at the delay from the first day that it says that the MAX-brand earplugs were sold online in 2004. But laches begins to run from the time McKeon should have known of the violation—not from when the violation began. *See, e.g.*, *Nartron*, 305 F.3d at 409. As we have already explained above that time is 2017, when the sales began to spike. McKeon sued in 2018, which is well within the six-year statutory period. So, Honeywell is not entitled to a presumption of unreasonableness or prejudice. *Laukus v. Rio Brands, Inc.*, 391 F. App'x. 416, 420 (6th Cir. 2010) (explaining that the presumption of prejudice to the defendant applies only when the plaintiff files suit outside the statute of limitations). In fact, the

presumption here favors McKeon's claim being timely and unprejudicial.**3** As McKeon puts it, Honeywell "gambled that it found a loophole in the Consent Order" so that it can "exploit the Retail Market." (Appellee Br. at 31.)  Honeywell has lost that bet.  Laches does not apply to these facts.

## V.

We next turn to whether the consent decree bars Honeywell's online retail sales.  Consent decrees are interpreted under the contract law of the state in which the parties entered them. *Evoqua Water*, 940 F.3d at 228–29.  Our goal is to determine the parties' intent at the time of the decree.  *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477–78 (6th Cir. 2007).  This construction must take place within the document's four corners.  *Alexander*, 496 F.3d at 478. We cannot "reform the contract to compensate one party for making a bad bargain." *Huguley v. Gen. Motors Corp.*, 67 F.3d 129, 133 (6th Cir. 1995).

This issue boils down to whether a retail website, like Amazon, is a "retail establishment" under the Decree.  It is.  Michigan gives a contract's undefined terms the plain and ordinary meaning that would be apparent to a reader of the instrument.  *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005).  And the plain and ordinary meaning of "retail establishment" reaches Amazon and similar websites.  First, the consent decree explicitly classifies "mass merchandisers"—companies like Walmart, Target, and Meijer—as "retail establishments." (R.32-2, Consent Decree, PageID 32.)  Amazon competes directly with these companies. Second, and together with "mass merchandisers," the consent decree lists "sporting goods stores," and the "Drug and Grocery Market" as examples of "retail establishments."  (*Id.* at PageID 30.)  Retail shoppers go to each of these places to purchase goods for personal use.  They do the same on Amazon.  Third, "retail establishments" are not limited to brick-and-mortar stores.   The parties  explicitly defined  the "Retail Market"  as "all  retail establishments

---

**3**Honeywell argues that the analogous statute of limitations is the three-year period under Michigan's trademark law.  We think this is mistaken.  The action here is one to enforce a consent decree.  Since courts treat consent decrees as contracts, the most analogous statute here is the one governing the enforcement of contracts.  *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) ("[A] consent decree or order is to be construed for enforcement purposes basically as a contract.").  But it doesn't matter because even under the three-year statutory period for bringing a trademark claim, McKeon's claim was still timely for the reasons stated above.

including the D[r]ug and Grocery Market, sporting goods stores and mass merchandisers." (*Id.*) That construction is illustrative, not exhaustive. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012). So a retail website is a "retail establishment."

Concluding that Amazon is a "retail establishment" also makes sense given the parties' intent. *Kendzierski v. Macomb County*, 931 N.W.2d 604, 612 (Mich. 2019). The consent decree enjoins Honeywell from selling its non-MAX-brand earplugs into the "Retail Market." (R.32-2, Consent Decree, PageID 31.) The parties did this "to minimize the likelihood of confusion concerning the parties' respective trademarks by Leight's sale and marketing of earplugs sold under the trademarks 'MAX' or 'MAX-LITE' in the Retail Market." (*See id.* at PageID 31–32.) They entered the consent decree to keep MAX-brand earplugs out of the same physical "retail establishments" as MACK'S earplugs. So there is no reason that same consent decree would allow Honeywell to sell MAX-brand earplugs in online "retail establishments."

Neither of Honeywell's arguments to the contrary is persuasive. First, nothing in the consent decree limits the term "retail establishments" to brick-and-mortar storefronts. To the contrary, "any distributor or supplier" who services the "Drug and Grocery Market" is a "retail establishment" by the consent decree's explicit terms. (*Id.* at PageID 29–30.)

Second, Honeywell argues that because some manufacturing entities buy supplies on Amazon, Amazon is part of the Industrial Supply Market. We reject this argument for two reasons. First, the declaration Honeywell entered to establish that manufacturing entities buy earplugs on Amazon fails to meet the standard in the consent decree. Honeywell's declaration never states that "manufacturing entities purchase earplugs and other hearing protection for their employees' use" on Amazon. (*Compare id.* at PageID 30, *with* R. 61-1, Larkin Decl., PageID 385 ("Businesses can and do purchase industrial supplies and similar products on Amazon.com.") *and id.* at PageID 387 ("Beyond industrial supplies, I am also aware that companies can and do procure office supplies and other business-related products on Amazon.com.").) So nothing in the record below establishes that Amazon meets the consent decree's definition of "Industrial Safety Market."

More to the point, defining the scope of the "Industrial Safety Market" with declarations could have never worked. It was always possible for some manufacturing entities to buy supplies at Walmart, for example. But no one could seriously contend a parade of declarations by those purchasing entities could remove a retailor like Walmart from the definition of "Retail Market." If a business is a "retail establishment" it simply doesn't matter that some manufacturing entities shop there. (*See* Appellee's Br. at 38–39.) Honeywell admitted as much to the magistrate judge. (*See* R.59, Hr'g on Mot. to Enforce, PageID 360.)

Think about it this way. Imagine, the day after the parties signed the consent decree, that Honeywell walked into court and presented declarations from manufacturing entities that they bought their hearing protection at Walmart and Walgreens. Would this have removed those entities from the retail market? Obviously not. Such an approach encourages and rewards bad behavior by Honeywell. It effectively redefines the Industrial Safety Market as everywhere Honeywell makes MAX-brand earplugs available and then some manufacturing entities buy them. McKeon bargained for more than that.

This leaves us with one loose end to tie up. The consent decree accounts for every conceivable sale of Honeywell's MAX-brand earplugs. It enjoins Honeywell from selling into the "Retail Market." But Honeywell remains free to sell in "the Industrial Safety Market or elsewhere." The "or elsewhere" savings clause reserves Honeywell's ability to sell to non-retail business. Might Amazon and other websites fall into the "or elsewhere" clause reserved to Honeywell? McKeon argues that this provision contemplates direct sales of MAX-brand earplugs to corporate consumers, like hotels, hospitals, or airlines. We agree. That answer fits neatly with the other provisions of the consent decree, and it resolves any surplusage problem with McKeon's interpretation.

## VI.

For the reasons above, we hold that laches is available to Honeywell as an affirmative defense, that it does not apply to these facts, and that McKeon's interpretation of the consent decree is the better reading. We thus **AFFIRM** the district court. And we **REMAND** for further proceedings consistent with this opinion including the dissolution of the stay.